**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Steven Updike, | No. CV-21-01379-PHX-DJH |
| Plaintiff, | **ORDER** |
| v. | |
| American Honda Motor Company Incorporated, et al., | |
| Defendants. | |

Defendant American Honda Motor Company Incorporated ("Defendant") has filed six Motions to Exclude Portions of Opinion Testimony by Plaintiff Steven Updike's ("Plaintiff") experts as outside the Scope of Federal Rule of Evidence 702[1] and *Daubert*. (Docs. 86, 88, 89, 91, 92 and 93). The matter is fully briefed. (Docs. 101–106, 114–119). For the following reasons, the Court declines to exclude Plaintiff's expert witnesses prior to trial.[2]

## I.      Background

Plaintiff has brought this wrongful death action on his own behalf and on behalf of all statutory beneficiaries of Decedent James Updike, Sr. ("Decedent")—Plaintiff's father. (Doc. 1-2 at 13). Plaintiff alleges that Decedent was driving a 2019 Honda Talon

---

[1] Any references to "rules" herein are in reference to the Federal Rules of Evidence, unless otherwise stated.

[2] The parties have requested oral argument in this matter, but the Court denies this request because the issues have been fully briefed and oral argument will not aid the Court's decision. *See* Fed. R. Civ. P. 78(b) (court may decide motions without oral hearings); LRCiv 7.2(f) (same).

manufactured by Defendant and that it rolled over in the Imperial Sand Dunes in Glamis, California on February 7, 2020.  (*Id*. at ¶¶ 10-15).  Plaintiff alleges that the Talon's rollover protection system ("ROPS") failed when the rear bar at the top of the roll cage directly behind and above the driver's head snapped, causing the roll cage to buckle and injure Decedent.  (*Id*. at ¶¶ 16-17).  The Talon's original safety harnesses were replaced with aftermarket Pro Armor harnesses by Plaintiff before the roll over.  (Doc. 89-7 at 4). Plaintiff brings claims for negligence, strict product liability, breach of express/implied warranty and punitive damages against Defendant.  (Doc. 1-2 at ¶¶ 20–52).  To support these claims, Plaintiff has retained several expert witnesses which Defendant now seeks to exclude.

## II.   Legal Standard

Rule 702 of the Federal Rules of Evidence tasks the trial court with a special "gatekeeping" obligation to ensure that any expert testimony provided is relevant and reliable.  *Daubert v. Merrell Dow Pharm*., Inc., 509 U.S. 579, 589 (1999).  A qualified expert may testify based on their "scientific, technical, or other specialized knowledge" if it "will assist the trier of fact to understand the evidence."  Fed. R. Evid. 702(a).  An expert may be qualified to testify based on his or her "knowledge, skill, experience, training, or education."  *Id*.  The expert's testimony must also be based on "sufficient facts or data," be the "product of reliable principles and methods," and the expert must have "reliably applied the principles and methods to the facts of the case."  *Id*. at 702(b)– (d).  "Rule 702 should be applied with a 'liberal thrust' favoring admission."  *Messick v. Novartis Pharmaceuticals Corp.*, 747 F.3d 1193, 1197 (9th Cir. 2014) (quoting *Daubert*, 509 U.S. at 588).

*Daubert's* general holding applies to an expert's testimony based on "scientific" knowledge, but also to testimony based on "technical" and "other specialized" knowledge.  *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999).  *Daubert* suggests a number of factors for courts to consider in discharging its gatekeeping obligation; however, these factors do not apply to testimony that depends on knowledge

and experience of the expert, rather than a particular methodology. *United States v. Hankey*, 203 F.3d 1160, 1169 (9th Cir. 2000) (citation omitted) (finding that *Daubert* factors do not apply to a police officer's testimony based on twenty-one years of experience working undercover with gangs). Furthermore, "[t]he inquiry envisioned by Rule 702" is "a flexible one." *Daubert*, 509 U.S. at 594. "The focus . . . must be solely on principles and methodology, not on the conclusions that they generate." *Id*. The proponent of expert testimony has the ultimate burden of showing that the expert is qualified and that the proposed testimony is admissible under Rule 702. *See Lust v. Merrell Dow Pharm., Inc*., 89 F.3d 594, 598 (9th Cir. 1996). The trial court is vested with broad discretion deciding whether an expert is qualified to testify. *See, e.g., General Elec. Co. v. Joiner*, 522 U.S. 136, 142 (1997); *United States v. Espinosa*, 827 F.2d 604, 611 (9th Cir.1987) ("The decision to admit expert testimony is committed to the discretion of the district court and will not be disturbed unless manifestly erroneous").

That the opinion testimony aids, rather than confuses, the trier of fact goes primarily to relevance. *See Temple v. Hartford Ins. Co. of Midwest*, 40 F. Supp. 3d 1156, 1161 (D. Ariz. 2014) (citing *Primiono v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010)). Evidence is relevant if it has "any tendency to make a fact more or less probable than it would be without the evidence and the fact is of consequence in determining the action." Fed. R. Evid. 401. However, an expert witness, "cannot give an opinion as to her legal conclusion, i.e., an opinion on an ultimate issue of law." *United States v. Diaz*, 876 F.3d 1194, 1197 (9th Cir. 2017) (internal citations omitted); *see also* Fed. R. Evid. 704.

## III.    Discussion

Defendant seeks to exclude six of Plaintiff's purported experts: Dr. Andrew Rentschler, Dr. James Mason, Dr. Michael Markushewski, Mr. Mark Cannon, Dr. Daniel M. Wolfe, and Mr. Jamie Winkler. (Docs. 86, 88, 89, 91, 92 93). Plaintiff has responded to each of Defendant's Motions arguing that their experts should not be excluded as "this is not a case where the severe and sparingly imposed remedy of pre-trial exclusion of any of Plaintiff's experts is justified under *Daubert*." (*E.g.*, Doc. 101 at 2). The Court will

address the Parties' arguments for and against the exclusion of each expert in turn, beginning with Dr. Markushewski as some of the other experts' opinions rely on his expert opinion.

### A.    Dr. Markushewski

Defendant seeks to exclude Dr. Markushewski's opinion that the Decedent was "properly wearing the available seat belt restraints at the time of the Subject Accident" under Rules 403, 702 and *Daubert*.  (Doc. 89 at 3).  Defendant essentially argues that Dr. Markushewski's opinion is not based on reliable principles and methods as required by Rule 702(c) because: (1) he did not perform any testing to validate his opinion, and (2) he did not exclude other potential causes based on the evidence before him.  (*Id*. at 9–10).  Defendant also argues that Dr. Markushewski's opinions are "built on inadmissible hearsay" and should be excluded.  (Doc. 119 at 2).  Plaintiff argues in response that Dr. Markushewski's opinions are supported by eyewitness testimony and that testing conducted by Dr. Markushewski show's that a Talon occupant of Decedent's height and weight, wearing an identical helmet with identical harness settings, would not have struck his head on the roof of a Talon that did not sustain a ROPS failure and collapsed roof. (Doc. 103 at 5, 12).  Plaintiff also argues that Dr. Markushewski did not need to conduct testing to identify "load marks" on the Talon's harness.  (*Id*. at 12).  After discussing the relevant portions of Dr. Markushewski's opinions, the Court will address each of Defendant's arguments for exclusion in turn.

In Dr. Markushewski's expert report authored on May 23, 2022, he concludes that (1) the roll cage failed and the roof panel and roll cage tubing collapsed downward toward the driver occupant space, (2) Decedent's helmet was impacted by the collapsing roof and roll cage structure creating a mechanism for his ultimately fatal injuries, and (3) the roll cage structure is defectively designed and unreasonably dangerous and not suited for its intended purpose.  (Doc. 89-8 at 10).  In his supplemental rebuttal report authored on April 12, 2023, Dr. Markushewski further concludes that (1) Decedent "was wearing an appropriate helmet and was properly wearing the available seat belt/harness restraint"

and (2) the seat belt "provided the restraint necessary to prevent his neck injury in this protectable rollover incident if the roll cage does not collapse. The roll cage collapse into the occupant space compromised [Decedent's] ride-down space and was proximate to, and the mechanism for, his ultimately fatal neck injuries." (Doc. 89-9 at 16). Dr. Markushewski bases these opinions, in part, on an inspection of the Talon conducted in Phoenix, AZ on February 9, 2023. (*Id*. at 4).

Important here, Dr. Markushewski states that he inspected the Talon's restraint system. (*Id*. at 8). The Talon's restraint system is a "4-point, 3 inch wide manually adjusted harness manufactured by ProArmor." (*Id*.) The restraint system consists of:

> a manually adjustable lap belt with a center lift-lever locking mechanism with a secondary Velcro attachment tab. The shoulder harnesses are sewn onto the lap belts such that the lift lever will simultaneously latch the lap belts and shoulder harnesses with one center latch. A central cross strap connects the shoulder harnesses together. The upper section of shoulder harness is wrapped around a cross bar behind the seat and held in place with a 3-bar slide adjuster. The inboard and outboard lap belt anchors are mounted to brackets on the inboard and outboard sections of the vehicle frame.

(*Id*.) Dr. Markushewski states that the "as-found" adjustment positions of the lap belts and shoulder harnesses on the Talon were documented and that the lap belt and shoulder harness adjustments had been moved from Decedent's adjusted position to accommodate Gregory Updike, Decedent's son, who drove the vehicle back to the camp after the incident. (*Id*. at 9). Gregory Updike testified to this and stated that he knew the restraints were tight because of the way Decedent was sitting restrained against them after the roll-over and because he had to loosen the restraints a great deal to get them on and then retighten it. (Doc. 103-1 at 38, 25–26). Dr. Markushewski examined the restraint system and found that the lap belt "displayed a full width linear abrasion evident approximately 12 inches from the outboard lap belt anchor." (Doc. 89-9 at 9). He also found that the lap belt displayed a full width linear abrasion evident at approximately 12 inches from the inboard lap belt anchor. (*Id*. at 10).

Dr. Markushewski also conducted a "surrogate fit check" test where he had a

surrogate who was 5' 10-1/2" tall and weighed 227 pounds go through various clearance and restraint system measurements.  (*Id*. at 12).  Dr. Markushewski and his surrogate conducted an "inversion test" with a new Pro Armor 3 inch wide, 4-point restraint system in a machine which allows for testing of full-size vehicles in a rotational manner under a 1G environment.  (*Id*. at 13).  Based on this test, Dr. Markushewski states that the test Defendant's experts Michael Carhart and Eddie Cooper performed was flawed as they did not adjust the lap belt to where the "visually obvious dynamic loading marks left by [Decedent] during the incident" were.  (*Id*. at 15).  He also concluded that "the seat belt provided the restraint necessary to prevent [Decedent's] neck injury in this protectable rollover incident if the roll cage d[id] not collapse."  (*Id*. at 16).

Dr. Markushewski has also been deposed in this matter.  He discussed his conclusion that the lap belt displayed linear abrasion marks evident approximately 12 inches from the outboard and inboard lap belt anchors.  (*See* Doc. 89-7).  When asked about the characterization of the abrasion marks, Dr. Markushewski stated that they were "light abrasions as you would expect in a crash like this."  (*Id*. at 7).  When asked how much force was calculated to have applied to the webbing in pounds, Dr. Markushewski stated that he did not calculate the pounds of force Decedent would have experienced during the rollover—but estimates it at four or five Gs.  (*Id*.)  Dr. Markushewski also stated that friction creates broken fibers when the belt is loaded, but that these marks can occur from the webbing of the belt being in a position for a long period of time.  (*Id*.)  Dr. Markushewski did not attempt to re-create these marks through a "drop test," but he did do an inversion test with a surrogate.  (*Id*. at 7–8).  Dr. Markushewski admitted that the outboard abrasion mark could be a "set mark," a mark which does not have broken fibers, but confirmed that the inboard side abrasion mark looked like an impact mark and stated that the outboard side was likely both a set mark and abrasion mark based on his experience.  (*Id*. at 10).  He further stated that this mark "looks like a dynamic loading mark.  It's more than a set mark, which is just kind of a light fold.  This is much more than that."  (*Id*.)

1

### 1.      Dr. Markushewski's Opinion is Admissible

Defendant argues that Dr. Markushewski's opinion on the abrasion marks "is nothing more than [his] own 'say so,' and should be excluded." (Doc. 89 at 8). Defendant essentially argues that Dr. Markushewski should have, but did not, conduct a dynamic drop test to determine whether the "dynamic abrasion marks" arose under similar circumstances to the accident at issue. (*Id.*) Because he did not conduct this test, Defendant argues that Dr. Markushewski's opinion is not the product of reliable principles and methods and should therefore be excluded under Rule 702 and *Daubert*. (*See id.*) Plaintiff argues in response that these marks are visible to the naked eye and obvious from the discoloration at that part of the harness. (Doc. 103 at 9). He also argues that the inversion testing Dr. Markushewski conducted was sufficient. (*Id.* at 11–12).

Dr. Markushewski has a Bachelor of Science in Mechanical Engineering Technology. (Doc. 103-2 at 23). His *curriculum vitae* states that he has worked on crashworthiness issues, specifically, restraint systems since 1994. (*Id.* at 24). Indeed, Dr. Markushewski conducted an "inversion test" and found that Decedent was wearing the restraint system properly during the incident and that the roll cages collapse was the mechanism for his fatal neck injuries. (Doc. 89-9 at 16). When asked about the abrasion marks he found at the twelve-inch mark, Dr. Markushewski admitted that the outboard abrasion mark could be a set mark, but confirmed that the inboard side abrasion mark looked like an impact mark because there's torn fibers inside these marks and stated that the outboard side was likely both a set mark and abrasion mark—based on his experience. (Doc. 89-7 at 10). When asked whether he conducted any testing to demonstrate the difference between a set mark and an abrasion mark with broken fibers, Dr. Markushewski stated it wasn't necessary as he "relied upon prior publications, my own work and my experience to come up with that conclusion." (*Id.* at 8).

The Court finds that Dr. Markushewski has extensive experience, as he states in his CV, conducting research, design, testing and evaluating restraint systems. Based on

that experience, he is knowledgeable concerning the differences between set marks and abrasion marks.  This particular opinion depends on Dr. Markushewski's knowledge and experience, rather than a particular methodology; so, the *Daubert* factors do not apply to this opinion.  *Hankey*, 203 F.3d at 1169 (stating that the *Daubert* factors do not apply to testimony that depends on knowledge and experience of the expert, rather than a particular methodology).  It is also permissible, as Plaintiff notes, that a qualified expert may rely on their visual inspection of evidence to render an opinion. *See Icon-IP Pty Ltd. v. Specialized Bicycle Components, Inc*., 87 F. Supp. 3d 928, 940 (N.D. Cal. 2015) (finding that it is "a matter of common sense that a visual and manual inspection would be one acceptable way for a mechanical engineer to assess the structural characteristics of a bicycle seat."); *Fontem Ventures, B.V. v. NJOY, Inc*., 2015 WL 12743861, at *7 (C.D. Cal. Oct. 22, 2015) (noting that an "expert's opinions as to certain uncomplicated elements can be based on a visual inspection.").

Moreover, Defendant's argument goes to the weight of the evidence, not its admissibility.  *See Johnson v. City of San Jose*, 2023 WL 8852489, at *4 (N.D. Cal. Dec. 21, 2023) ("Defendants' arguments as to the evidentiary support for [the expert]'s opinions go to the weight of his testimony, rather than its admissibility.") (citation omitted); *see also Wendell v. GlaxoSmithKline LLC*, 858 F.3d 1227, 1237 (9th Cir. 2017) ("Where, as here, the experts' opinions are not the 'junk science' Rule 702 was meant to exclude, the interests of justice favor leaving difficult issues in the hands of the jury and relying on the safeguards of the adversary system—vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof[.]"). This evidence "should be attacked by cross examination, contrary evidence, and attention to the burden of proof [rather than] exclusion." *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010).

Finally, the Court finds that Dr. Markushewski's purported testimony is more probative than prejudicial, so, the Court will not exclude his testimony under Rule 403. Rule 403 states that the trial court "may exclude relevant evidence if its probative value is

substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. Here, Dr. Markushewski's testimony is highly probative as it establishes how Decedent was injured as well as that the design of the roll cage was defective. (Doc. 89-8 at 10). This probative value of Dr. Markushewski's testimony is also bolstered by the fact that Dr. Rentschler stated that he is relying on Dr. Markushewski's opinion to come to his own conclusion on the mechanism of Decedent's injury. (Doc. 86-8 at 4). Finally, although this evidence may be somewhat prejudicial to Defendant's case, "[v]irtually all evidence is prejudicial or it isn't material." *Old Chief v. United States*, 519 U.S. 172, 193 (1997) (O'Connor, J., dissenting) (citations omitted). Any prejudice this evidence and testimony may hold is outweighed by its probative value. *See* Fed. R. Evid. 403.

Thus, the Court will not exclude Dr. Markushewski for not performing testing to validate his opinion.

## 2.    Other Potential Causes

Defendant also argues that Dr. Markushewski should be excluded because he failed to rule out other potential causes for the abrasion marks based on the evidence before him. (Doc. 89 at 12 (citing *Walsh v. LG Chem Am.*, 2021 WL 4859990, at *5–6 (D. Ariz. Oct. 19, 2021)). It also argues that an expert "must provide reasons for rejecting alternative hypothesis using scientific methods and procedures and elimination of those hypotheses must be founded on more than subjective beliefs or unsupported speculation." (*Id.* (citing *Messick v. Novartis Pharms. Corp.*, 747 F.3d 1193, 1198 (9th Cir. 2014)). Not so.

This argument essentially relies on the differential diagnosis sub-body of *Daubert* law which has been endorsed by the Ninth Circuit. Differential diagnosis is "the determination of which of two or more diseases with similar symptoms is the one from which the patient is suffering, by a systematic comparison and contrasting of the clinical findings." *Clausen v. M/V NEW CARISSA*, 339 F.3d 1049, 1057 (9th Cir. 2003). "The

1    first step in the diagnostic process is to compile a comprehensive list of hypotheses that
2    might explain the set of salient clinical findings under consideration. The issue at this
3    point in the process is which of the competing causes are generally capable of causing the
4    patient's symptoms or mortality.." *Clausen*, 339 F.3d at 1057–58.  The second step is for
5    the expert to "engage in a process of eliminating or ruling out the identified potential
6    causes." *Stanley v. Novartis Pharms. Corp*., 11 F. Supp. 3d 987, 1001 (C.D. Cal. 2014)
7    "When an expert rules out a potential cause in the course of a differential diagnosis, the
8    'expert must provide reasons for rejecting alternative hypotheses using scientific methods
9    and procedures and the elimination of those hypotheses must be founded on more than
10   subjective beliefs or unsupported speculation.' "  *Messick*, 747 F.3d at 1198 (citing
11   *Clausen*, 339 F.3d at 1058).

12            As stated above, Dr. Markushewski's opinion regarding abrasion marks depends
13   on his knowledge and experience, rather than the use of scientific methods and
14   procedures; therefore, he does not need to provide reasons for rejecting alternative
15   hypothesis using scientific methods and procedures.  *Clausen*, 339 F.3d at 1057–58.  This
16   argument also goes to the weight of the evidence and not its admissibility—so, this
17   evidence "should be attacked by cross examination, contrary evidence, and attention to
18   the burden of proof [rather than] exclusion." *Primiano*, 598 F.3d at 564.  The Court
19   declines to exclude Dr. Markushewski's because he did not chase alternate explanations
20   for the abrasion marks.

### 3.    Hearsay

22            Defendant also argues that Dr. Markushewski's opinions are "built on
23   inadmissible hearsay."  (Doc. 119 at 2).  The Federal Rules of Evidence clearly denote
24   that expert witnesses may rely on inadmissible evidence to form their opinion (including
25   hearsay) if experts in that particular field would rely on "those kinds of facts or data."
26   Fed. R. Evid. 703; *Carson Harbor Vill., Ltd. v. Unocal Corp*., 270 F.3d 863, 873 (9th Cir.
27   2001) ("experts are entitled to rely on hearsay in forming their opinions.").  Not only
28   would other experts in this field rely on eyewitness testimony, but some of Defendant's

experts have relied on Greg Updike's testimony.  (Doc. 89-4 at 6 (expert report of Dr. Graeme Fowler)).  Specifically, Dr. Graeme Fowler relied on Greg Updike's testimony to reconstruct decedents accident.  (*Id*. at 7–12).  In fact, one of Plaintiff's experts, Dr. Wolfe, criticized Dr. Fowler for relying "entirely on witnesses who did not see the incident, with the exception of Greg Updike, who caught a split second of the incident in his rear-view mirror."  (Doc. 92-2 at 11).  So, because other experts have relied on this "hearsay," Dr. Markushewski is allowed to rely on the conversation between Dr. Jim Mason and Gregory Updike—especially since Gregory Updike confirmed what Dr. Mason told Dr. Markushewski when he was deposed, which is what Dr. Markushewski actually relied on in his expert report.  (Doc. 89-9 at 9).

In sum, the Court declines to exclude Dr. Markushewski from testifying.

### B.    Dr. Rentschler

Defendant next argues that Dr. Rentschler's opinions should be excluded because (1) he relies on Dr. Markushewski's opinion and is acting as a "conduit" for his opinions and (2) Dr. Markushewski's opinions are faulty.[3]  (Doc. 86 at 8, 11).  Defendant seeks to exclude Dr. Rentschler under Rules 403 and 702 as well as Daubert for his "unblinking" reliance on Markushewski's opinions.  (*Id*. at 8).  Plaintiff argues that, even though Dr. Rentschler relies on Dr. Markushewski's opinion, his opinion is still admissible as this reliance does not provide a basis for exclusion.  (Doc. 101 at 6, 8).  Plaintiff also argues that he can prove his claims without this evidence—which is an argument raised in the parties' summary judgement motions.[4]  (*Id*. at 8).

The opinions of multiple experts may be necessary in a complex case to establish a party's theory of liability or to fully defend against liability.  *See In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Pracs., & Prod. Liab. Litig*., 978 F. Supp. 2d 1053, 1066 (C.D. Cal. 2013).  An expert's opinion may find its basis in part "on what a

---

[3] This argument is a repeat of Defendant's argument that Dr. Markushewski's are not admissible, which the Court rejected above.

[4] The Court will address this argument in a separate order addressing the parties' summary judgment motions.

different expert believes on the basis of expert knowledge not possessed by the first expert." *Id.* (citing *Dura Auto. Sys. of Ind., Inc. v. CTS Corp.*, 285 F.3d 609, 613 (7th Cir. 2002)). "For example, a physician may rely for a diagnosis on an x-ray taken by a radiologist, even though the physician is not an expert in radiology." *Id.* "There are limits to this general rule, however. Where the 'soundness of the underlying expert judgment is in issue,' the testifying expert cannot merely act as a conduit for the underlying expert's opinion." *Id.* (citing *Dura Auto. Sys.*, 285 F.3d at 613). An expert's "sole or primary reliance on the opinions of other experts raises serious reliability questions." *In re ConAgra Foods, Inc.*, 302 F.R.D. 537, 556 (C.D. Cal. 2014). More scrutiny is given to an expert's "reliance on the information or analysis of another expert where the other expert opinions were developed for the purpose of litigation." *In re Toyota Motor Corp.*, 978 F. Supp. 2d at 1066 (citation omitted).

Here, Dr. Markushewski's opinions were created for the purposes of litigation, so, given increased scrutiny, the question is whether Dr. Rentschler is "merely acting as a conduit" for Dr. Markushewski's opinions.

Plaintiff retained Dr. Rentschler to opine on the "mechanism" of Decedent's injury. (Doc. 101 at 4). In his preliminary report, Dr. Rentschler concludes that:

> 1. On February 7, 2020, Mr. James Updike Sr. was driving a 2019 Honda Talon on sand dunes in Glamis, California when the Talon pitched forward over the top of a dune and rolled end-over-end before coming to rest on all four wheels.
>
> 2. The roll cage failed and the roof panel and roll cage collapsed downward toward the driver occupant space during impact with the sand dune.
>
> 3. Contact occurred between the top of Mr. Updike's helmeted head and the intruding roof structure/roll cage during the rollover event.
>
> 4. The injury mechanism responsible for Mr. Updike's C2 nondisplaced type II/III fracture of the dens involves localized hyperextension with associated compression. ***This injury mechanism resulted from the contact between Mr. Updike's helmeted head and the intruding roof structure/roll cage during the subject incident.***

(Doc. 86-9 at 10) (emphasis added). The Court notes that Rentschler's conclusions 1–3

are substantially similar to the conclusions that Dr. Markushewski came to, but his fourth conclusion is unique.  (*See id.*)  To come to this conclusion, Dr. Rentschler reviewed medical records, the inspection done by Dr. James Mason, Dr. Mason and Dr. Markushewski's written reports, "other available documents."  (*Id.* at 4–5).  From his review, he states the following opinion:

> The loading paradigms experienced by Mr. Updike's cervical spine during the various phases of the subject incident were investigated in the context of the mechanisms responsible for damage to the various tissues and the constellation of injuries he presented with. As previously described, the initial contact between the front of the nosed-down Honda and the sand dune would have resulted in forward and upward motion of Mr. Updike's body relative to the occupant space in the Honda. As the four-point restraint system retained Mr. Updike's torso, his cervical spine loading paradigm would primarily consist of cervical flexion and tension, inconsistent with the mechanisms for his cervical spine injuries. Similarly, the inertial loading of Mr. Updike's cervical spine as the vehicle came to rest would not be sufficient to cause injury. During the contact between the ROPS and the sand (i.e. while inverted), Mr. Updike's body would have accelerated upward and toward his seatback. Mr. Updike's cervical spine would have experienced extension and tension until being contacted by the intruding roof structure and possibly the head restraint in the Honda. In the absence of contact between Mr. Updike's head and the intruding roof structure/roll cage, no significant injury mechanisms would be expected during this phase.
>
> The intruding roof structure/roll cage contacted Mr. Updike's helmet, facilitating a combination of compression and local hyperextension of the upper cervical spine, with possible shear force of C1 on C2. The resulting cervical motions and forces were sufficient to cause type III fracture of the dens in combination with failure of the anterior longitudinal ligament and widening of the C1-2 articulations as noted in the available diagnostic studies.

(*Id.* at 9–10).

At his deposition, Dr. Rentschler testified that he became involved in this matter because of Dr. Markushewski.  (Doc. 86-8 at 3).  Dr. Rentschler states that he was tasked with addressing the biomechanical aspects of the case, which include: "look[ing] at the injury that [Decedent] sustained, considering the injury mechanism, how that injury

occurred as a result of the incident and then, ultimately, what [were] any factors involved in the actual injury and, ultimately, could it have been prevented based on our findings if there was an issue with the vehicle." (*Id.*)  When asked what other experts he has relied on, Dr. Rentschler stated that he is relying on Dr. Markushewski because "[h]e was the one who inspected and analyzed the restraint system in this case and determined -- that basically did the testing -- the inversion testing with respect to that to determine what the clearance would have been for [Decedent] based on his interpretation of the settings for the restraint system." (*Id.* at 4).  When asked what the opinions are that he has generated himself, Dr. Rentschler testified that his opinions are that:

> [Decedent's] cervical injuries, certainly, the C2 odontoid fracture and cervical spine injury at that level was the result of contact between the top of his helmet and the roof of the subject Honda Talon during the rollover event, that based on, again, the restraint system and Mr. Markushewski's findings, that absent the deformation to the ROPS system sustained during the incident rollover, that Mr. Updike would have had sufficient clearance within the vehicle during the event to prevent any contact between his head or helmet and the roof of the vehicle and that, therefore, absent deformation or crush damage to the ROPS, that Mr. Updike would not have sustained the cervical injuries that he did as a result of the incident.

(*Id.* at 7).

The Court finds that Dr. Rentschler is not acting as a conduit for Dr. Markushewski.  Dr. Rentschler can rely on Dr. Markushewski's opinion as Rentschler's opinion builds upon Markushewski's analysis and Markushewski's testimony is admissible.  *See In re Toyota Motor Corp.*, 978 F. Supp. 2d at 1066.  While Dr. Rentschler certainly references Dr. Markushewski's expert opinion, he utilizes this opinion to come to his own conclusion: that "[t]he injury mechanism responsible for [Decedent's] C2 nondisplaced type II/III fracture of the dens involves localized hyperextension with associated compression. This injury mechanism resulted from the contact between [Decedent's] helmeted head and the intruding roof structure/roll cage during the subject incident." (Doc. 86-9 at 10).  The Court finds that the relationship between Dr. Rentschler and Dr. Markushewski's is akin to a physician relying on a

radiologist for a diagnosis on an x-ray—they have been retained to give opinions on different areas of expertise. *See In re Toyota Motor Corp.*, 978 F. Supp. 2d at 1066. Dr. Rentschler is not simply regurgitating Dr. Markushewski's opinion but is utilizing his opinion to come to his own opinion on the injury mechanism—an area which Dr. Markushewski has not opined. (Doc. 86-8 at 3). Since Dr. Rentschler is using Markushewski's opinion as a reference point, the Court will not exclude his opinion. *Townsend v. Monster Beverage Corp*., 303 F. Supp. 3d 1010, 1035 (C.D. Cal. 2018) ("an expert may validly use another expert's report as a reference point for his own assessments.") (citation omitted).

The Court also finds that the probative value of Dr. Rentschler's testimony is not outweighed by the danger of prejudice his reliance on Dr. Markushewski presents. As stated above, an expert may rely on another expert's opinion to establish their own opinion. *See In re Toyota Motor Corp.*, 978 F. Supp. 2d at 1066. There is no danger of unfair prejudice or misleading the jury because Dr. Rentschler's reliance on Dr. Markushewski's opinion as a reference point for his own opinion is lawful. *Townsend*, 303 F. Supp. 3d at 1035. Furthermore, the probative value of Dr. Rentschler's anticipated testimony is high as he will establish the mechanism of Plaintiff's neck injury. Fed. R. Evid. 403.

In sum, the Court declines to exclude Dr. Rentschler at this juncture.

### C.      Dr. Mason

Defendant next argues that Dr. Mason should be excluded as his opinions are untested, inherently unreliable, and, therefore, inadmissible. (Doc. 88 at 11). It also states that Mason has done no case specific testing at all. (*Id*. at 16). Plaintiff argues that Dr. Mason's opinion does not have to be supported by testing. (Doc. 102 at 8).

Plaintiff retained Dr. Mason to "assess the pre-drilled design of the ROPS bar and tubing that failed during [Decedent's] rollover." (Doc. 102 at 6). Dr. Mason is a doctor in "applied (fracture) mechanics." (*Id*.) Dr. Mason concluded in his expert report that:

The ROPS was defective in design due to the introduction of a hole in the

underside of the rear cross bar and due to the use of thin-walled tubes in its construction, i.e. tubes with too large of a diameter and too small of a wall thickness. The aftermarket components attached to the rear crossmember were foreseeable and likely increased the stress around the hole in the crossmember by approximately 3-4%, much less than the hole itself.

(Doc. 88-6 at 5-6).  Dr. Mason's opinions are stated as follows:

To a reasonable degree of engineering certainty, I have formed the following opinions.

1. The roll over protection system (ROPS or roll cage) in the Honda deformed and fractured due to downward forces applied to the top.

2. Reportedly, the vehicle was going approximately 20-25 miles per hour (mph) over soft sand dunes when it encountered a sloped drop-off of approximately 15-25 feet and pitched forward, conditions that were foreseeable and that the ROPS should have been designed to easily survive.

3. A fracture resulting in intrusion of the ROPS into the passenger compartment from above occurred at a hole that was introduced into the underside of the rear cross bar during manufacture. The location and size of the hole resulted in the stress around the hole being approximately three times higher than if the hole had not been introduced. Consequently, the hole made the cross bar three times weaker.

4. The use of tubing that was approximately 2 inches in diameter with a wall thickness of approximately 1116 inch introduced localized inelastic tube buckling as a failure mode, and consequently weakened the ROPS overhead structure, allowing the B-pillar support and the C-pillar support to buckle, resulting in intrusion of the ROPS into the passenger compartment from above during this incident.

5. The use of tubing that was approximately 2 inches in diameter with a wall thickness of approximately 1116 inch resulted in a ROPS system that could easily collapse when subjected to bending as a result of buckling andlor impact, as it partially did in the left B and C pillars, resulting in intrusion of the ROPS into the passenger compartment from above during this incident.

6. The thin wall of the tubing allowed the left longitudinal bar to deform and bend near its connection to the left B pillar, resulting in intrusion of the ROPS into the passenger compartment from above during this incident.

(*Id*. at 3-4).  Dr. Mason also states that:

The introduction of a hole in the bottom of the crossbar was a bad idea from the start. Engineers are taught that holes create stress concentration

and then they are taught how to minimize the increased risk of failure that such holes create. The introduction of the hole made the cross bar three times weaker than it was without the hole. The logical alternative designs include eliminating the hole or moving the hole to the top or side of the tube. This is basic engineering.

. . .

Further destructive investigation is needed to determine whether the collapse of the ROPS was due to manufacturing defect.

(Doc. 88-5 at 8). In sum, his opinion is that: "[t]he ROPS was defective in design due to the introduction of a hole in the underside of the rear cross bar and due to the use of thin walled tubes in its construction, i.e. tubes with too large of a diameter and too small of a wall thickness." (*Id.*)

During his deposition, Dr. Mason stated that he has "d[one] an estimate of the force that occurred based on some of the numbers given by others in this case, particularly, I want to say, Mr. Fowler." (Doc. 88-7 at 3). He did not, however, conduct testing to confirm what amount of force is required to produce the deformation on the Talon's roof or fracture the cross bar. (*Id.*) In fact, Dr. Mason has not done any testing of his own in this matter; but he did calculate that the approximate force the Talon endured during the roll-over was approximately 7,200–9,000 pounds of force given the weight of the Talon and speed approximated by Mr. Fowler. (*Id.* at 3–4).

Here, Dr. Mason is certainly qualified as an expert. Fed. R. Evid. 702(a). He is a doctor in "applied (fracture) mechanics." (Doc. 102 at 6). He has also taught courses related to "materials science and failure of materials." (Doc. 88-5 at 2). He has also conducted studies to evaluate the fracture of metals, plastics, and composites. (*Id.*) Based on his education, training and experience the Court finds that Dr. Mason is a qualified expert. Fed. R. Evid. 702. Dr. Mason was forthcoming in his deposition about his expertise in this matter, admitting many areas, such as what conditions the ROPS should be able to survive, injury causation, and "quasistatic tests" (tests where force is applied at various points and measured), were outside of his expertise. (*See* Doc. 88-7). Dr. Mason did calculate, in theory, that the Talon endured 7,200–9,000 pounds of force

given the weight of the Talon and speed Decedent was going which was approximated by Mr. Fowler.  (*Id*. at 3).  While Dr. Mason did not perform any of his own testing, the admissibility of expert testimony "does not depend on the expert personally performing testing," however.  *Speaks v. Mazda Motor Corp*., 118 F. Supp. 3d 1212, 1219 (D. Mont. 2015) (citing Fed. R. Evid. 702).

Like Dr. Markushewski, much of Dr. Mason's opinions and conclusion are based on his knowledge and experience; meaning that the *Daubert* factors do not apply to his testimony.  *See Hankey*, 203 F.3d at 1169 (finding that *Daubert* factors do not apply to a police officer's testimony based on twenty-one years of experience working undercover with gangs).  Dr. Mason himself states that his opinions are based on his education, background, knowledge, and experience in the fields of materials science, fracture mechanics, and mechanical engineering.  (Doc. 88-5 at 2).  Based on the above, the Court finds that Dr. Mason is qualified to testify on the failure of the Talon's crossbar generally and will not exclude his from testifying at this juncture.

Dr. Mason's opinion is ripe for rigorous cross-examination, not exclusion.  *See Primiano*, 598 F.3d at 564.

### D.     Mr. Cannon

Defendant next argues that Mr. Cannon should be excluded as his disclosure is untimely and because he is not qualified to testify regarding the adequacy of warnings. (Doc. 91 at 3).  Defendant also argues that his testimony will not aid the jury.  (*Id*. at 8). Defendant states that it anticipates Mr. Cannon will testify that "(1) [Defendant] should have mentioned and/or more fulsomely highlighted any safety risk associated with the installation and placement of the certain aftermarket accessories (i.e., the lighted whip and antenna) in the Talon's Owner's Manual" and that "(2) the flagpole bracket information in the Owner's Manual is 'deficient,' 'not reasonable,' not 'appropriate,' and does not 'follow [Dorris'] recommended format regarding warnings relative to safety.'" (*Id*. at 3).  Defendant argues that Mr. Cannon is really a case-in-chief expert as Plaintiff's Complaint includes "failure to warn" allegations in both the negligence and strict liability

counts.  (Doc. 91 at 3 n.4).

Plaintiff argues that Mr. Cannon is qualified by both experience and training as a "human factors expert" because he has a masters degree in advanced safety and engineering management and has over 25 years of experience in forensic engineering and investigates a wide variety of mechanical and safety issues.  (Doc. 104 at 5–6).  Plaintiff does not address Defendant's timeliness argument.  (*See* Doc. 104).  The Court will review these arguments in turn.

Federal Rule of Civil Procedure 26(a)(2)(B) requires the parties to disclose the identity of each expert witness "accompanied by a written report prepared and signed by the witness."  Fed. R. Civ. P. 26(a)(2)(B).  Expert disclosures must be made according to the deadlines set by the Court.  *Id*. at 26(a)(2)(D).  A rebuttal expert may only testify after the opposing party's initial expert witness testifies.  *Lindner v. Meadow Gold Dairies, Inc*., 249 F.R .D. 625, 636 (D. Hawaii 2008).  Specifically, rebuttal expert testimony must address the "same subject matter" identified by the initial expert. Fed. R. Civ. P. 26(a)(2)(C)(ii); *Lindner*, 249 F.R.D. at 636.

Under Rule 16(f), a court may issue "any just orders" where "a party or party's attorney fails to obey a scheduling or pretrial order." Fed. R. Civ. P. 16(f).  The Ninth Circuit has held that the purpose of Rule 16 is "to encourage forceful judicial management."  *Sherman v. United States*, 801 F.2d 1133, 1135 (9th Cir. 1986).  Whether to issue sanctions under Rule 16(f) is left to the sound discretion of the district court.  *See Ayers v. City of Richmond*, 895 F.2d 1267, 1269 (9th Cir. 1990) (citing *Ford v. Alfaro*, 785 F.2d 835, 840 (9th Cir.1986)).

Plaintiff states that he retained Mr. Cannon to "rebut Dr. Fowler's inference that [Defendant's] warnings were sufficient to inform Talon owners that the use of an aftermarket mounting bracket or radio antenna might cause the Talon's ROPS to break and its roof to collapse during a slow speed rollover in soft sand."  (Doc. 104 at 2).  The Court's Rule 16 Scheduling Order set the following deadlines: Plaintiff's expert disclosure deadline – May 22, 2022; Defendant's expert disclosure deadline - September

27, 2022; Plaintiff's rebuttal expert deadline - October 12, 2022.  (Doc. 10 at 3).

Importantly, this order states that "[r]ebuttal experts shall be limited to responding to

opinions stated by initial experts."  (*Id*. at 3).  The Court also extended the deadline for

the "disclosure of experts and completion of expert discovery" to July 28, 2023.

(Doc. 71).

Mr. Cannon's expert report, authored on December 6, 2022, states that the

"assignment and scope" of his engagement is to "evaluate and comment on the reports

submitted by Dr. Fowler and Dr. Dorris on behalf of American Honda. Specifically, I was

asked to address the issue of information and warnings provided on the Honda Talon and

the contrast between the findings in Drs. Fowler's and Dorris' reports."  (Doc. 104-

1 at 2).  Mr. Cannon reviewed these reports (*Id*. at 3–6) and addressed his concerns with

them.  (*Id*. at 7–8).  Mr. Cannon notes that he does not disagree with Dr. Dorris

"regarding the warnings and labels provided by [Defendant] on the Talon with respect to

the specific subject matters that the warnings address" but that "[a]ntenna and flag pole

bracket mounting are not addressed in these warnings and the information about the

bracket, as cited by Dr. Fowler, does not comport with the warnings format extolled by

Dr. Dorris."  (*Id*.)  Mr. Cannon concludes that:

> Dr. Fowler criticizes [Decedent] for placing the Quick Light whip and the
> Rugged Radio aerial antenna where they were found mounted to the Talon
> because they compromised the strength of the cross-member and
> "undoubtedly" applied a concentrated load, increasing the bending stresses.
> Dr. Fowler is describing actions that are critical to safety. However, the
> information in the manual upon which Dr. Fowler bas[e]s his opinion on
> the mounting decision does not follow the methodology in putting forth
> safety information in an explicit format that Dr. Dorris opines is adequate.
> ***If the flag pole mounting information is as critical as Dr. Fowler
> describes, then it needs to follow Dr. Dorris' recommended format
> regarding warnings relative to safety***. And by Dr. Dorris' reckoning, the
> flagpole bracket information in the manual is deficient and not reasonable
> nor appropriate.

(*Id*. at 8) (emphasis added).

Reviewing these opinions, the Court finds that Mr. Cannon is responding to

opinions stated by Defendant's experts: Dr. Dorris and Dr. Fowler.  Thus, the Court, in its discretion, declines to exclude Mr. Cannon because that he is not a "case-in-chief expert in rebuttal expert clothing."  (Doc. 91 at 1); *Ayers*, 895 F.2d at 1269.

Lastly, the Court finds that Mr. Cannon's testimony is admissible because he is a qualified expert, and his report contradicts or rebuts Dr. Fowler's report; as the Court found above.  *See Lindner*, 249 F.R.D. at 636.  Furthermore, his testimony is relevant as his testimony will necessarily attack the credibility of Defendant's experts and "it is the jurors' responsibility to determine credibility by assessing the witnesses and witness testimony in light of their own experience."  *United States v. Sine*, 493 F.3d 1021, 1034–35 (9th Cir. 2007) (internal citation omitted).  So, the Court declines to exclude Mr. Canon.  *Messick v*, 747 F.3d at 1197.  However, since Mr. Cannon is designated as a rebuttal expert, he cannot testify in Plaintiff's case-in-chief or at all unless and until Defendant's experts testify as to the opinions for which he has been designated as a rebuttal expert.  *See Lindner*, 249 F.R.D. at 636.

### E.    Dr. Wolfe

Next, Defendant seeks to exclude Mr. Wolfe on the basis that he (1) lacks the knowledge, training, and experience required to render the opinions in his report, (2) he merely restates Dr. Fowler's opinions, and (3) he misstates the law by invading the province of the jury and the Court.  (Doc. 92 at 1).  Defendant states that Plaintiff retained Mr. Wolfe to "assume the role of Monday morning quarterback" and critique Dr. Fowler's accident reconstruction.  (Doc. 92 at 4). Plaintiff argues that he retained Dr. Wolfe to

> rebut Dr. Fowler's opinions by evaluating Dr. Fowler's methodology of (1) simply fabricating data (like the Talon's speed) without any reliable scientific basis; (2) relying solely on witnesses who admit to not seeing the rollover or knowing anything about Jim's path of travel and (3) using measurements from what Dr. Fowler concedes is fundamentally a different sand dune at the same general location two years after the fact and which all agree has none of the same measurements or characteristics of the subject dune.

1   (Doc. 105 at 2).  Plaintiff also argues that he is entitled to offer rebuttal testimony under

2   *Daubert*.  (*Id*. at 12).

3          Again, rebuttal expert testimony must address the "same subject matter" identified

4   by the initial expert.  Fed. R. Civ. P. 26(a)(2)(C)(ii); *Lindner*, 249 F.R.D. at 636.  In other

5   words, "[t]he function of rebuttal testimony is to explain, repel, counteract or disprove

6   evidence of the adverse party." *Armer v. CSAA Gen. Ins. Co*., 2020 WL 3078353, at *5

7   (D. Ariz. June 10, 2020) (citing *Marmo v. Tyson Fresh Meats, Inc*., 457 F.3d 748, 759

8   (8th Cir. 2006)).  Deciding whether an opinion is a proper rebuttal opinion in nature is

9   largely a factual determination that is entrusted to the sound discretion of the district

10  court.  *See Estate of Goldberg v. Goss-Jewett Co., Inc*., 2019 WL 8227387, *2 (C.D. Cal.

11  2019).  However, "[e]xpert testimony should be excluded if it concerns a subject

12  improper for expert testimony" such as "one that invades the province of the jury."

13  *Taylor v. Cnty. of Pima*, 2023 WL 2652602, at *3 (D. Ariz. Mar. 27, 2023) (quoting

14  *United States v. Lukashov*, 694 F.3d 1107, 1116 (9th Cir. 2012).  The "province of the

15  jury" includes "[d]etermining the credibility of witnesses, resolving evidentiary conflicts,

16  and drawing reasonable inferences from proven facts." *Id*. (citing *Bruce v. Terhune*, 376

17  F.3d 950, 957 (9th Cir. 2004) (per curiam)).  Expert testimony is also inadmissible if it

18  "simply 'presents a narrative of the case which a lay juror is equally capable of

19  constructing.' " *Id*. (quoting *Taylor v. Evans*, 1997 WL 154010, at *2 (S.D.N.Y. Apr. 1,

20  1997)).

21          Dr. Wolfe is a Ph.D in Electrical and Computer Engineering and is accredited as a

22  traffic accident reconstructionist by the Accreditation Commission for Traffic Accident

23  Reconstruction.  (Doc. 109-1 at 166–167).  Indeed, as Plaintiff notes, other court's within

24  this district have found this accreditation to qualify an expert to testify regarding accident

25  reconstruction.  *Empire Fire & Marine Ins. Co. v. Patton*, 2019 WL 11544461, at *3 (D.

26  Ariz. Aug. 26, 2019) ("[the expert], as a certified accident reconstruction expert, is

27  qualified to testify about that conclusion.").

28          Dr. Wolfe states that he was asked to "review and evaluate" the report authored by

Dr. Fowler. (Doc. 92-2 at 2). To furnish an opinion of Fowler's report, Wolfe reviewed the following materials:

> (1) Photograph of James Updike in the Honda Talon; (2) Photographs and videos from Chris Taylor; (3) Photograph and videos from Mike Deschamps; (4) Photographs and videos from Scott Wedge; (5) Videos from Jason Treyvillyan; (6) Panoramic still of incident location; (7) Legal documents; (8) Medical documents pertaining to James Updike; (9) American Honda Motor Company, Inc., (AHM) produced discovery documents; (10) Deposition transcript of Chris Taylor [June 17, 2022]; (11) Deposition transcript of Dennis Engler [June 16, 2022]; (12) Deposition transcript of Gary Knight [May 24, 2022]; (13) Deposition transcript of Greg Updike [May 26, 2022]; (14) Deposition transcript of James Updike, Jr. [June 6, 2022]; (15) Deposition transcript of Jason Treyvillyan [June 16, 2022]; (16) Deposition transcript of Jeff Updike [June 7, 2022]; (17) Deposition transcript of John Gallagher [June 15, 2022]; (18) Deposition transcript of Layne Arnold [June 15, 2022]; (19) Deposition transcript of Mark Jensen [May 24, 2022]; (20) Deposition transcript of Michael Deschamps, Jr. [June 14, 2022]; (21) Deposition transcript of Omar Chavez [June 15, 2022]; (22) Deposition transcript of Scott Wedge [June 14, 2022]; (23) Deposition transcript of Sergeant Brandon Jacobs [June 17, 2022]; (24) Deposition transcript of Steven Updike [June 6, 2022]; (25) Deposition transcript of Troy Pieper [June 16, 2022]; (26) Deposition transcript of Vincent Gallagher [June 17, 2022]; (27) Report by Graeme Fowler, Ph.D., P.E. [November 18, 2022]; (28) Report by Eddie R. Cooper [November 18, 2022]; (29) Report by Michael Carhart, Ph.D. [November 18, 2022]; (30) Report by Nathan T. Dorris, Ph.D. [November 18, 2022]; [and] (31) Publicly available literature, including, but not limited to, the documents cited within the report, learned treatises, text books, and scientific standards.

(*Id.* at 2–3). From his review, Dr. Wolfe criticizes Dr. Fowler's opinion, stating that:

> Dr. Fowler's opinion regarding the dune profile is not founded or based upon a reasonable degree of scientific certainty. Dr. Fowler's basis for his opinion regarding the sand dune is based upon scan data of a different location and two cones placed by the Officers over 2 years after the subject incident. By his own admission, Dr. Fowler opines that the subject sand dune had migrated eastward and that none of the available file material provided a clear depiction to assist with establishing its size and geometry. Dr. Fowler also noted that multiple vehicles driving over the dune post-crash created additional difficulties in determining the path of the Honda and the impact location on the dune.

. . .

Based on a review of Dr. Fowler's report, he performed a trajectory or airborne analysis of the Honda as it traversed a dune (albeit not the subject dune topography). Dr. Fowler relied entirely on witnesses who did not see the incident, with the exception of Greg Updike, who caught a split second of the incident in his rear-view mirror. Dr. Fowler states that using the commercially available software program Working Model 2D, the speed at which the Talon left the dune crest was estimated and motion during the end-over incident was modeled. The Working Model 2D project appears to be based upon the aforementioned scan data of a nearby dune profile selected over 2 years after the subject incident. Based upon the fundamental laws of physics, the topography on which the Honda was traversing would have a direct effect on the kinematics and trajectory of the vehicle.

(*Id.* at 8–9). Dr. Wolfe offers the following specific conclusions/ opinions based on his review:

1) The description of the slope, rise, and run of the subject dune varied significantly based upon a review of the available deposition testimony.

2) There are no known measurements that were taken of the subject dune, such as, rise, run, or slope.

3) The deposition testimony clearly establishes that the terrain and topography of the subject dune has changed from February 7, 2020. This is also supported by literature regarding the environmental effects on sand dunes and by common sense.

4) Dr. Fowler's basis for his opinion regarding the characteristics or topography of the sand dune is based upon scan data of a location on a different dune face delineated by two cones placed 2 years after the subject incident by other recreational riders who happened to be off-duty officers.

5) Dr. Fowler's basis and foundation for his inputs into the Working Model 2D as it relates to the dune topography is not based upon any direct measurement of the subject dune.

6) Dr. Fowler's inputs for his analysis are not (and cannot be) based upon a reasonable degree of scientific certainty.

(*Id.* at 11–12).

The Court finds that Dr. Wolfe's testimony is proper rebuttal expert testimony. First, being a Ph.D in Electrical and Computer Engineering and being accredited as a traffic accident reconstructionist, Dr. Wolfe is qualified to testify as an expert on accident

reconstruction due to his education, training and experience.   Fed. R. Evid. 702. Furthermore, he does not simply restate Dr. Fowler's opinions—he contradicts them based on his review of the record—which is permissible.   *See Carter v. Johnson & Johnson*, 2022 WL 4700575, at *3 (D. Nev. Sept. 29, 2022) ("an expert can criticize another expert's methodology without affirmatively disproving the matter himself.") (citation omitted).   In fact, "[t]his type of testimony [is] much more informative than merely presenting those issues to [the opposing party's expert] on cross-examination" as it is "helpful to the trier of fact to hear these criticisms from an expert."   *Id*. (quoting *Aero-Motive Co. v. Becker*, 2001 WL 1698998, *4-6 (W.D. Mich. Dec. 6, 2001)).   Dr. Fowler was asked to "reconstruct the accident based upon the materials provided, the inspections and analyses described below and, my knowledge and experience in the field of off-road vehicle design, performance, and operation."   (Doc. 92-4 at 2).   Dr. Wolfe, through his own report, has attempted to "repel, counteract or disprove" Dr. Fowler's opinions—which is the "function of rebuttal testimony."   *Armer*, 2020 WL 3078353, at *5.   For example, Dr, Wolfe critiques Dr. Fowler for relying "entirely on witnesses who did not see the incident, with the exception of Greg Updike, who caught a split second of the incident in his rear-view mirror."   (Doc. 92-2 at 11).   He also states that Dr. Fowler's opinions "regarding the dune profile [are] not founded or based upon a reasonable degree of scientific certainty" because his basis for his opinion regarding the sand dune is "based upon scan data of a different location and two cones placed by the Officers over 2 years after the subject incident."   (*Id*. at 8).   Thus, Dr. Wolfe's attempts to rebut the credibility of Dr. Fowler's opinions through these opinions and conclusions will be helpful to the trier of fact since he is also an expert.   *See Carter*, 2022 WL 4700575, at *3.

Furthermore, Dr. Wolfe is not "misstating the law" as he does not opine on any "ultimate issue."   Fed. R. Evid. 704.   Instead, his testimony attempts to rebut the credibility of Dr. Fowler's expert opinion.   Defendant is correct that "[d]etermining the credibility of witnesses [falls] within the exclusive province of the jury," *Taylor*, 2023 WL 2652602, *3, but to determine credibility, the opposing party may advance evidence

that a witness is not credible.  The Federal Rules of Evidence specifically allow this type of testimony: "Any party, including the party that called the witness, may attack the witness's credibility."  Fed. R. Evid. 607.  So, Dr. Wolfe has not misstated the law.

Dr. Wolfe's testimony is also relevant, so, it will aid, rather than confuse, the jury. *See Temple*, 40 F. Supp. 3d at 1161; Fed. R. Evid. 702(a).  Dr. Wolfe's testimony will necessarily attack the credibility of Dr. Fowler's and, again, "it is the jurors' responsibility to determine credibility by assessing the witnesses and witness testimony in light of their own experience."  *Sine*, 493 F.3d 1021, 1034–35 (9th Cir. 2007) (internal citation omitted).  Of course, as a rebuttal expert, he cannot testify in Plaintiff's case-in-chief and cannot testify at all unless and until Dr. Fowler testifies as to the opinions for which has been designated as a rebuttal expert.  *See Lindner*, 249 F.R.D. at 636.

In sum, the Court finds that Dr. Wolfe's opinions are proper rebuttal opinions in nature, which is a determination entrusted to the sound discretion of this Court, *Estate of Goldberg*, 2019 WL 8227387, *2, and the Court will not exclude him from testifying as such.

### F.    Mr. Winkler

Finally, Defendant seeks to exclude Plaintiff's damages expert, Jamie Winkler, as his opinions are "wholly inconsistent with Arizona law with respect to the damages recoverable by individual beneficiaries in a wrongful death action."[5]  (Doc. 93 at 1).  Defendant argues that Mr. Winkler's opinions will not assist the jury because (1) he has used the wrong legal standard in calculating the losses [Decedent's] Estate incurred as a result of his death and (2) his methodology is unreliable.  (*Id*. at 7, 8).  It also argues that Mr. Winkler is not qualified to testify as an expert because: (1) he is not a certified public accountant; (2) he has never obtained any certifications in the field of finance; and (3) does not have any graduate level education.  (*Id*. at 4–5).  Plaintiff argues that Mr. Winkler is a qualified expert and that his testimony is admissible as Decedent's statutory

---

[5] Defendant states that Decedent's statutory beneficiaries "have derived and will continue to derive substantial economic benefits as a result of [Decedent's] estate planning that they would not have enjoyed but for his death."  (Doc. 93 at 4).

beneficiaries are entitled to lost future income.  (Doc. 106 at 3, 12).

### 1.   Mr. Winkler's Opinions

Mr. Winkler was engaged to "opine on damages stemming from the alleged wrongful death of [Decedent]."  (Doc. 93-6 at 4).  Winkler states in his initial expert report that he has "extensive experience in the determination of economic damages, including matters involving lost earnings." (*Id*.)  Mr. Winkler holds a bachelor's degree in economics as well as finance and "has experience in cases involving personal injury, breach of contract, patent and trademark infringement, and franchise matters, among other causes of action." (*Id*. at 9).  He has also "issued expert reports and offered testimony on such matters." (*Id*.)

In this report, Mr. Winkler approximates Decedent's lost earnings for his work life expectancy (74 years old) and his life expectancy (84 years old).  (Doc. 93-6 at 8).  Decedent was 70 years old at the time of his death.  (*Id*. at 4).  Decedent was the president of Updike Distribution Logistics ("UDL") a company he founded and owned 25% of.  (*Id*. at 4, 16).  Mr. Winkler estimates Decedent's total damages at $4,550,211 for his work life expectancy and $5,377,091. (*Id*. at 8). This is based on Decedent's lost salary of approximately $106,000 per year as well as quarterly profit distributions from UDL.  (*Id*. at 5–6).  To estimate the value of these quarterly profit distributions, Mr. Winkler projected UDL's net income through Decedent's life expectancy and assumed a "conservative" two-percent annual growth rate.  (*Id*. at 6–7).  Based on this analysis, Mr. Winkler states that "the total value of [Decedent's] Future Lost Distributions is $14,285,342" but that he then "discounted this revenue stream back to the date of this report" at a rate of 18.8%.  (*Id*. at 7).  Applying this discount rate, Mr. Winkler calculates "the present value of [Decedent's] Future Lost Distributions [as] $5,454,939." (*Id*.)  Mr. Winkler also takes into account that Decedent's 25% stake in UDL was bought out for $3,356,000 and off sets this price by the present value of the buyout price ($1,936,923) to calculate an offset of $1,419,077.  (*Id*. at 8).  Finally, Mr. Winkler calculated a "consumption offset" for the expenditures Decedent would have incurred if he were

alive.  (*Id.*)  Mr. Winkler calculated that a rate of 13.5% based on the "Patton-Nelson Personal Consumption Tables," a "reputable study that considers gender, income, and household size."  (*Id.*)  Mr. Winkler also provides tables and schedules which show, in detail, howe he came to these calculations.  (*Id.*)

Mr. Winkler also provided a rebuttal expert report in response to Defendant's expert: Craig Reinmuth.  (Doc. 106-1 at 20).  Reinmuth's report "argues that Valerie [Updike (Decedent's spouse)] sustained zero damages, despite being deprived of an income stream that would have generated millions over the coming years."  (*Id.* at 21).  Mr. Winkler states that Mr. Reinmuth's report reduces Winkler's damages calculation by 97% but that this is driven by "unsupported or otherwise flawed adjustments."  (*Id.*)  Winkler admits that Reinmuth's report identified an error within his calculated life expectancy which added an extra year to Decedent's life expectancy.  (*Id.*)  Mr. Winkler also admits that Reinmuth's report identified an error in the buyout offset calculation where the "but-for buyout" was not discounted to the date of the actual buyout, but the date of his report which results is a 10% reduction.  (*Id.* at 22).  There also seems to be some dispute between Mr. Winkler and Mr. Reinmuth in whether to deduct income taxes from the damages calculation since this is a "legal determination" which "hinges on whether the awarded damages will be taxable."  (*Id.* at 27).  In sum, Mr. Winkler states that he has incorporated the following changes to his report:

- Adjusts life expectancy to February 13, 2034
- Adjusts measurement date of buyout offset to May 14, 2020
- Updates discount rates based on current U.S. Treasury yields
- Updates UDL Projection based on actual performance through Q3 2022
- Presents an alternative which accounts for income taxes

(*Id.* at 28).  Mr. Winkler provides the following summary of his calculations:

/ / /

/ / /

/ / /

| | Original (Pre-Tax) | Updated Pre-Tax | Updated After-Tax | Reinmuth After Tax |
|---|---|---|---|---|
| Lost Salary | $ 1,322,817.00 | $ 1,178,029.00 | $ 792,319.00 | $ 660,380.00 |
| Lost Distributions | $ 6,313,464.00 | $ 5,882,322.00 | $ 4,659,712.00 | $ 1,614,541.00 |
| Buyout Offset | $ (14,191,991.00) | $ (1,902,118.00) | $ (1,426,588.00) | $ (2,105,177.00) |
| **Lost Earnings** | **$ 6,216,291.00** | **$ 5,158,234.00** | **$ 4,025,444.00** | **$ 169,744.00** |
| Consumption offset | $ 839,199.00 | $ 696,362.00 | $ 543,435.00 | $ 22,915.00 |
| **Total Damages** | **$ 5,377,091.00** | **$ 4,461,872.00** | **$ 3,482,009.00** | **$ 146,829.00** |

(*Id*.)  Mr. Winkler has also provided exhibits showing how he came to these conclusions based on his calucaltions.  (*See id*. at 32–39).

## 2.    Mr. Winkler is Qualified to Testify as an Expert

First, the Court finds that Mr. Winkler is a qualified expert witness.  An expert may be qualified by "knowledge, skill, experience, training, or education." Fed. R. Evid. 702.  Mr. Winkler holds a bachelor's degree in economics as well as finance—which are directly relevant to his opinions. (Doc. 93-6 at 9).  Mr. Winkler also has relevant experience evaluating and calculating economic losses, specifically as it pertains to economic losses in various personal injury cases.  (Doc. 106-1 at 29–30). While Mr. Winkler's experience in testifying is sparce, "[p]rior experience need not consist of prior expert witness testimony on the same issue." *In re ConAgra Foods, Inc*., 302 F.R.D. 537, 551 (C.D. Cal. 2014) (citation omitted); *see also id*. ("If witnesses could not testify for the first time as experts, we would have no experts").  In fact, the "threshold for qualification is low for purposes of admissibility; minimal foundation of knowledge, skill, and experience suffices." *Id*. (citation omitted).  The Court finds that Mr. Winkler meets this "low" threshold through his knowledge, experience and education as he has relevant education and experience.  *See id*; *see also Diviero v. Uniroyal Goodrich Tire Co*., 919 F. Supp. 1353, 1357 (D. Ariz. 1996), *aff'd*, 114 F.3d 851 (9th Cir. 1997) ("An expert's experience is given significant weight in determining the witness'

qualifications as an expert if only technical knowledge is required. If, however, scientific knowledge is necessary the expertise must be coextensive with the particular scientific discipline.").

### 3. Mr. Winkler's Methodology is Sufficiently Supported

Next, Defendant's argument that Mr. Winkler's methodology is unreliable does nor persuade the Court to exclude him. Most of Defendant's arguments, such as Mr. Winkler's assumption that Decedent would have worked through his natural life, are disagreements with the basis for Mr. Winkler's opinions. These arguments go to the weight of this evidence, not its admissibility, as these assumptions are based on the facts. *Johnson*, 2023 WL 8852489, at *4 ("Defendants' arguments as to the evidentiary support for [the expert]'s opinions go to the weight of his testimony, rather than its admissibility."); *see also United States v. L.E. Cooke Co*., 991 F.2d 336, 342 (6th Cir. 1993) ("any weaknesses in the factual basis of an expert witness' opinion . . . bear on the weight of the evidence rather than on its admissibility").

Furthermore, Defendant's argument that Mr. Winkler failed to use a "company risk factor" is not a basis for exclusion because "[n]ormally, failure to include variables will affect the analysis' probativeness, not its admissibility." *Hemmings v. Tidyman's Inc*., 285 F.3d 1174 (9th Cir. 2002) (quoting *Bazemore v. Friday*, 478 U.S. 385, 400 (1986)). Instead, a "vigorous cross-examination" allows the jury to "appropriately weigh the alleged defects and reduces the possibility of prejudice." *Id*. (citation omitted). Stated differently, Mr. Winkler's report is not "so incomplete as to be inadmissible as irrelevant." *Id*; *see also Primiano*, 598 F.3d at 564 ("Shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion."). In sum, the Court, in its discretion, finds that Mr. Winkler has supported his methodology such that exclusion at this stage would be improper. *See Joiner*, 522 U.S. at 142.

### 4. Mr. Winkler's Opinions are Consistent with Arizona law

Finally, Defendant's argument that Mr. Winkler's damages calculation is

inconsistent with Arizona law is unpersuasive.   Defendant specifically argues that Winkler has "made no attempt to calculate the 'reasonable value of the economic support and maintenance' which [Decedent] may have provided to the statutory beneficiaries during his lifetime." (Doc. 93 at 7).  Plaintiff argues that "[i]t is settled Arizona law that a surviving spouse is entitled to recover '[t]he income and services that have already been lost as a result of the death, and that are reasonably probable to be lost in the future.' " (Doc. 106 at 4 (citing Revised Arizona Jury Instructions ("RAJI") (Civil) (7th Ed.)).

In Arizona, "[a]s a general rule, a plaintiff in a tort action is entitled to recover such sums as will reasonably compensate him for all damages sustained by him as the direct, natural and proximate result of such negligence, provided they are established with reasonable certainty."  *Nunsuch ex rel. Nunsuch v. United States*, 221 F. Supp. 2d 1027, 1034 (D. Ariz. 2001 (quoting *Continental Life & Accident Co. v. Songer*, 124 Ariz. 294, 304 (1979)). "Arizona allows unlimited recovery for actual damages, expenses for past and prospective medical care, past and prospective pain and suffering, ***lost earnings***, and diminished earning capacity." *Id.* (quoting *Wendelken v. Superior Court in and for Pima County*, 137 Ariz. 455, 671 P.2d 896 (1983) (emphasis added).  However, "[l]oss of earnings is an item of special damage and must be specially pleaded and proved." *Id.* (quoting *Mandelbaum v. Knutson*, 11 Ariz. App. 148, 149, 462 P.2d 841, 842 (1969)). In a wrongful death action, "wrongful death damages are statutorily limited to injuries 'resulting from the death,' which may include the decedent's prospective earning capacity."  *Walsh v. Advanced Cardiac Specialists Chartered*, 229 Ariz. 193, 196, 273 P.3d 645, 648 (2012) (internal citations and quotations omitted).  Statutory beneficiaries in a wrongful death action "can recover their economic loss resulting from death." *Popal v. Beck*, 2022 WL 457363, at *3 (Ariz. Ct. App. Feb. 15, 2022).

Here, as Defendant itself notes, A.R.S. § 12-613 permits a damage award to "the surviving parties who may be entitled to recover" which include a "surviving husband or wife, child, parent or guardian, or personal representative" on their behalf.  A.R.S. § 12-612(A).  Indeed, an "estate is not entitled to economic damages under the wrongful death

statute because it can seek such damages only if none of the statutory beneficiaries survive." *Popal*, 2022 WL 457363, at *3. Here, however, Decedent is survived by his statutory beneficiaries and they have brought this action under A.R.S. § 12-612 as "beneficiaries" and specifically seek "surviving statutory wrongful death" damages. (Doc. 1-2 at 13, 21 ("[Plaintiff] is the surviving biological son of [Decedent] and brings this action for himself and for all eligible statutory wrongful death beneficiaries under A.R.S. § 12-612(A), including Valerie Updike, the decedent's surviving wife, and the decedent's surviving sons, James Updike, Jr., Greg Updike and Jeffrey Updike.")). So, Mr. Winkler's calculations are not "inconsistent with Arizona law" as A.R.S. § 12-612 specifically allows for the recovery of loss of future earnings in a wrongful death action. *See Walsh*, 273 P.3d at 648; *Popal*, 2022 WL 457363, at *3.

In sum, the Court will not exclude Mr. Winkler here.

## IV.     Conclusion

For the reasons stated above, the Court declines to exclude Plaintiff's expert witnesses: Dr. Michael Markushewski, Dr. Andrew Rentschler, Dr. James Mason, Mr. Mark Cannon, Dr. Daniel Wolfe, and Mr. Jamie Winkler in its discretion. *See Joiner*, 522 U.S. at 142. Of course, Defendant may re-raise any relevant 702/*Daubert* objections to a witnesses' testimony or qualifications at trial.[6]

Accordingly,

**IT IS ORDERED** that Defendant's Motions to Exclude Portions of Opinion Testimony (Docs. 86, 88, 89, 91, 92 and 93) are **DENIED without prejudice**.

Dated this 13th day of September, 2024.

_____
Honorable Diane J. Humetewa
United States District Judge

---

[6] The Court will exercise its discretion to limit expert testimony it finds may be cumulative during the course of trial.